# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| **CHAD ZINI,** | **)** | |
| | **)** | |
| **Plaintiff,** | **)** | |
| | **)** | |
| **vs.** | **)** | **Case No. 3:23-cv-02120-GCS** |
| | **)** | |
| **CITY OF JERSEYVILLE,** | **)** | |
| | **)** | |
| **Defendant.** | **)** | |
| | **)** | |

## <u>MEMORANDUM & ORDER</u>

**SISON, Magistrate Judge:**

Pending before the Court is Plaintiff's Motion for Preliminary Injunction. (Doc. 15). Plaintiff, Chad Zini ("Zini"), filed the Motion on August 11, 2023, requesting the Court to prevent Defendant, the City of Jerseyville ("Jerseyville" or "City") from interfering with the sale of delta-8 products at his business. *Id.* Defendant filed a Memorandum in Opposition to Plaintiff's Motion for Preliminary Injunction on August 28, 2023. (Doc. 21). Plaintiff then filed a Reply in Support of Plaintiff's Motion for Summary Judgment on September 5, 2023. (Doc. 22). A hearing on the Motion for Preliminary Injunction was held on January 11, 2024.[1] (Doc. 30). For the reasons delineated below, the Court **DENIES** Plaintiff's Motion for Preliminary Injunction. (Doc. 15).

---

[1]    The Court would like to thank the parties for their assistance at the hearing held on January 11, 2024, and for providing the Court with comprehensive briefing materials on this matter.

PROCEDURAL BACKGROUND

Zini, initially filed this case in the Seventh Judicial Circuit, Jersey County, Illinois on September 13, 2022. (Doc. 1, Exh. 1). He amended his complaint on June 7, 2023. (Doc. 1, Exh. 2). In his amended complaint, Zini requests the Court to declare that the City of Jerseyville's § 6-5C-5 Ordinance[2] and § 6-5C-7 Ordinance[3] are invalid under Illinois law. *Id.* at p. 6, 9.  Moreover, Zini requests that the Court enjoin the City from enforcing these ordinances as it relates to tobacco or cannabis pipes and delta-8 products. *Id.* at p. 6, 9. Lastly, Zini requests the Court to find that the City violated his Fourteenth Amendment Due Process rights, in limiting the pursuit of his occupation of choice when it interfered with his right to sell the aforementioned products. *Id.* at p. 11. The City properly removed

---

[2]    JERSEYVILLE, IL., CODE § 6-5C-5 (2023). In relevant part, Ordinance 6-5C-5, titled "Drug Paraphernalia," provides that: "[n]o person or business shall acquire, offer for sale, sell, or deliver any item defined by Illinois state law (720 ILCS 660/2 (d)) as drug paraphernalia, knowing, or under circumstances where one reasonably should know, that such drug paraphernalia will be used to ingest, inject, inhale, or otherwise introduce into the human body any controlled or banned substance under state law (720 ILCS 570/102), and if that item has also been deemed by the Chief of Police or his designee, upon a supported basis, to be an item almost wholly used to ingest, inject, inhale, or otherwise introduce into the human body any controlled or banned substance under state law (720 ILCS 570/102), including but not limited to, glass tubing commonly utilized for ingestion of crack cocaine, glass or metal pipes commonly used to inhale or to introduce any controlled or banned substance into the human body. Upon the order of the Chief of Police or his designee, with the supported basis that an item or items are used almost wholly to ingest, inject, inhale, or otherwise introduce into the human body controlled or banned substances under state or federal law, or this ordinance as stated above, the person or business shall cease to expose for sale, sell or offer for sale, or delivery to any person, directly or indirectly, the item or items so designated within 14 days of the issuance of such order."

[3]    JERSEYVILLE, IL., CODE § 6-5C-7 (2023). Ordinance 6-5C-7, titled "Banning Controlled Substances Known as 'MDPV' or 'Bath Salts'" indicates that "it shall be unlawful for any person to possess, distribute, deliver, or use any substance containing 'MDPV' as defined in this section." The ordinance lists delta-8 THC as an "MDPV."

the case to this Court pursuant to 28 U.S.C. § 1331 and § 1441 on June 20, 2023. (Doc. 1, p. 2).

## FACTUAL BACKGROUND

Zini owns and operates several stores under the name, "The Cave." (Doc. 15, Exh. 2). He currently operates stores in the municipalities of Alton, Fairview Heights, and Wood River Illinois. *Id.* At each of these locations, Zini sells delta-8 products that he purchases from U.S. based distributors. *Id.* The distributors provide independent lab tests demonstrating that the products contain no more than 0.3 delta-9 tetrahydrocannabinol ("THC"). Zini does not sell products containing more than 0.3 delta-9 THC, and thus adheres to what is colloquially known as the "0.3% Rule." *Id.*

In 2021, Zini signed a commercial lease to open a new location of "The Cave" in Jerseyville, Illinois. (Doc. 1, Exh. 2, p. 1). Plaintiff remodeled the location in preparation for its opening. *Id.* Around October 2021, Zini was informed by the City that he would be subject to civil and criminal penalties for selling drug paraphernalia pursuant to Ordinance 6-5C-5. *Id.* In December 2022, members of the Jerseyville Police Department threatened criminal and civil prosecution if Zini sold delta-8 products in violation of City Ordinance 6-5C-7. *Id.* at p. 9-10.

For purposes of the instant motion, the parties jointly agreed to the following set of stipulated facts:

- The cannabis sativa plant species is a plant species which produces what is more commonly known as "hemp" and "cannabis." The difference between "hemp" and "cannabis" comes from the level of THC.[4]

- The cannabis plant contains about 540 chemical substances. Within the cannabis sativa plant, there exists over 100 cannabidiols (CBD), along with tetrahydrocannabinol (THC).

- "CBD" is an acronym for cannabidiol, which is a phytocannabinoid found in the plant. It is undisputed CBD has little to no psychoactive effect on humans.

- "THC" is an acronym for Tetrahydrocannabinol (THC), which is a phytocannabinoid. There are different types of THC inside the cannabis plant. Delta-10, delta-9, and delta-8 THC are known to have psychoactive effects on humans.

- The chemical difference between delta-10, delta-9, and delta-8 THC involves where the double bond of the carbon atoms fall. Delta-8 has a double bond on the eighth carbon atom. Delta-9 on the ninth. Delta-10 possesses the double bond on the tenth carbon atom. The significance of where the double bond is located involves the psychoactivity of the compound.[5]

- Delta-9 is by all accounts the most psychoactive of the THC compounds. That is not to say delta-8 (or delta-10) has no psychoactive effect. Rather, it is widely accepted that delta-8 and delta-10 are less psychoactive than delta-9 THC.

---

[4]

https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3736954/#:~:text=and%20their%20differen ces.,Delta%2D9%2Dtetrahydrocannabinol%20and%20cannabidiol,both%20in%20animals%20an d%20humans. Last accessed October 5, 2023.

[5]

https://sc.edu/uofsc/posts/2023/04/conversation_cannabis_derived_products.php#:~:text=T he%20chemical%20difference%20between%20delta,on%20the%2010th%20carbon%20atom. Last access October 5, 2023.

- Any product with a delta-9 THC concentration of more than .03% is federally banned, and to this date is a Scheduled 1 narcotic. (However, the FDA has approved medicine with delta-9 for treatment of chemotherapy-induced nausea and stimulating appetite in HIV/AIDS patients.)[6]

- Delta 8 and delta 10 are not approved by the FDA. Delta-8 and delta-10 are not referenced or scheduled.

(Doc. 29).

## LEGAL STANDARDS

A preliminary injunction is "an exercise of a very far-reaching power, never to be indulged in except in a case clearly demanding it." *Finch v. Treto*, 82 F.4th 572, 578 (7th Cir. 2023) (quoting *Cassell v. Snyders*, 990 F.3d 539, 544 (7th Cir. 2021)). The remedy is not to be granted as of right. *See Doe v. University of Southern Indiana*, 43 F. 4th 784, 791 (7th Cir. 2022). Rather, granting a preliminary injunction is meant to "preserve the relative positions of the parties until a trial on the merits can be held." *Tully v. Okeson*, 78 F.4th 377, 381 (7th Cir. 2023) (quoting *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981)). Moreover, the issuance of a preliminary injunction should "minimize the hardship to the parties pending final judgment." *Faheem-El v. Klincar*, 841 F.2d 712, 717 (7th Cir. 1988).

"The party seeking a preliminary injunction bears the burden of showing that it is warranted." *Finch*, 82 F.4th at 578 (quoting *Speech First Inc. v. Killeen*, 968 F.3d 628, 637 (7th Cir. 2020)). In the Seventh Circuit, "a district court engages in an analysis that proceeds

---

[6] *See* Footnote 5. *See also* https://www.nccih.nih.gov/health/cannabis-marijuana-and-cannabinoids-what-youneed-to-know#:~:text=What%20are%20the%20main%20cannabinoids,THC%20and%20cannabidiol%20(CBD). Last accessed October 5, 2023.

in two distinct phases" when deciding whether a preliminary injunction is an appropriate remedy: "a threshold phase and a balancing phase." *Valencia v. City of Springfield*, 883 F.3d 959, 965 (7th Cir. 2018). To succeed the movant must show the following: (1) a likelihood of success, and "'not merely a better than negligible chance'" or possibility of success on the merits; (2) that traditional legal remedies are inadequate, which means "seriously deficient" when compared to the harm, such that there is a likelihood of irreparable harm in the absence of a preliminary injunction; and (3) a showing that the balancing of the equities, *i.e.*, the harm to the parties in granting or denying the preliminary injunction, tips in the movant's favor and advances the public interest. *Doe*, 43 F.4th at 791 (quoting *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 24 (2008)).

The first and second requirements make up the threshold phase inquiries, meaning the Court will only proceed to the third requirement if the first two requirements are satisfied. *See Life Spine, Inc. v. Aegis Spine, Inc.*, 8 F.4th 531, 539 (7th Cir. 2021). Under the first requirement, a party need not show a likelihood of success on the merits by a preponderance of the evidence, but he or she "must nevertheless make a 'strong' showing that reveals how it proposes to prove its case." *See Bevis v. City of Naperville, Illinois*, 85 F. 4th 1175, 1188 (7th Cir. 2023). *Accord Illinois Republican Party v. Pritzker*, 973 F.3d 760, 763 (7th Cir. 2020). It should be noted that when assessing the merits of the claims, the Court does not accept Zini's allegations as true, draw reasonable inferences in his favor, or give Zini the benefit of conflicting evidence, as is appropriate in other contexts. *See Doe*, 43 F. 4th at 791-792 (citing *Alarm Detection Sys., Inc., v. Village of Schaumburg*, 930 F.3d 812, 823 (7th Cir. 2019).

If the threshold requirements are met, "the court must balance the equities, weighing the harm to the moving party if the requested injunction is denied against the harm to the nonmoving party- and the public – including third parties – if it is granted." *Finch*, 82 F.4th at 578 (citing *Cassell*, 990 F.3d at 545). In the second phase, "the [C]ourt weighs the harm of denying an injunction to the movant against the harm of granting an injunction to the nonmovant." *Grubhub Inc., v. Relish Labs LLC*, 80 F.4th 835, 844 (7th Cir. 2023). This is accomplished via a "sliding scale – the greater the movant's likelihood of success on the merits, the less the harms need to be in its favor." *Id*. The Court must also consider the public interest. *Id.*

## DISCUSSION

In their briefing and at the hearing, the parties argued over whether Zini could legally sell delta-8 THC products in the City. Zini notes that the term "delta-8" is used to refer to products containing no more than 0.3% delta-9 THC. Zini argues that Illinois and Federal law treat delta-8 THC products as hemp and is thus legal, so long as it contains no more than 0.3% delta-9 THC. If a product contains more than 0.3% of delta-9 THC it is considered a cannabis product and is thus a Schedule I drug, which is regulated at the federal and state level. Because each of his products contain less than 0.3% delta-9 THC, Zini believes he can legally sell his products in the City.

The City, on the other hand, argues that products containing delta-8 THC are in a grey area. While it acknowledges that delta-8 is not scheduled, it believes it is enforcing a federal prohibition on such products. The City bases this belief on the position taken by the United States Drug and Enforcement Agency ("DEA"), which has issued certain

interpretive letters of the Controlled Substances Act and its accompanying regulations. Because products containing delta-8 THC fall within a grey area, the DEA, as the agency tasked with enforcing these regulations, can act to fill this gap, and its interpretation should be afforded deference.

Both sides agree that Illinois and federal law are the same on this matter. Both sides also agree that the merits of this motion turn on whether products containing delta-8 THC are prohibited under federal law. An overview of the United States' drug enforcement regime and the regulations related thereto is thus helpful to understanding the context of the case before the Court.

The Controlled Substances Act ("CSA") establishes five controlled substance schedules. *See* 21 U.S.C. § 812. "Controlled substances are placed on a particular schedule based on their potential for abuse, their accepted medical use in treatment, and the physical and psychological consequences of abuse of the substance." *Raich v. Gonzales*, 500 F.3d 850, 854 (9th Cir. 2007) (citing 21 § U.S.C. § 812(b)). "Marihuana" (also known as marijuana) has been regulated under the CSA since 1970 and is listed in Schedule I due to its high potential for abuse, in large part due to the psychoactive effects of THC.

Until recently, federal law prohibited the growth and cultivation of hemp. However, in 2014, President Barak Obama signed into law the Agricultural Act of 2014 ("2014 Farm Act"), which allowed states and research institutions to cultivate industrial hemp for research purposes without approval from the United States Drug Enforcement Administration ("DEA"). Pub. L. No. 113-79, § 7606. The 2014 Farm Act defined "industrial hemp" as the plant "Cannabis sativa L. and any part of such plant, whether

growing or not, with a delta-9 THC concentration of not more than 0.3% on a dry weight basis." 7 U.S.C. § 5940(a)(2).

In 2018, the Agriculture Improvements Act of 2018 ("2018 Farm Act") repealed and replaced the 2014 Farm Act, legalizing the "possession and cultivation of hemp." Pub. L. No. 115-334, 132 Stat. 4490; *AK Futures LLC v. Boyd St. Distro*, LLC, 35 F.4th 682, 686 (9th Cir. 2022). Notably, the 2018 Farm Act amended the definitions in the CSA to exclude (1) hemp from the definition of "marihuana" and "marijuana" and (2) the type of THC found in hemp from the definition of THC. *See Duke's Investments LLC, v. Char*, CIVIL NO. 22-00385, 2023 WL 3166729, at * 1 (D. Haw. April 28, 2023) (citing *AK Futures*, 35 F.4th at 690). The 2018 Farm Act's definition of "hemp" is as follows: "[t]he term "hemp" means the plant Cannabis sativa L. and any part of that plant, including the seeds thereof and all derivatives, extracts, cannabinoids, isomers, acids, salts, and salts of isomers, whether growing or not, with a delta-9 [THC] concentration of not more than 0.3 percent on a dry weight basis." 7 U.S.C. § 1639o(1).

The DEA has issued two letters clarifying the definition of "hemp" under the CSA and what substances remain regulated under schedule I. The first letter, issued on September 15, 2021, found that delta-8 THC synthetically produced from non-cannabis materials qualifies as controlled substances under the CSA as a tetrahydrocannabinol.[7] Subsequently, on February 23, 2023, the DEA issued a second letter concluding that both

---

[7]     Letter from Terrence L. Boos, Drug & Chem. Evaluation Section Chief, Drug Enforcement Admin., U.S. Dept. of Justice, to Donna C. Yeatman, Exec. Sec's, Ala. Bd. Of Pharmacy (September 15, 2021).

delta-8 THCO and delta-9 THCO[8] continue to be controlled substances under the CSA.[9] (Doc. 21, p. 7).

Zini argues that the delta-8 products he sells clearly come within the federal definition of hemp described above and is thus legal to sell. In fact, the Ninth Circuit reached this very same conclusion in *AK Futures LLC v. Boyd St. Distro*, LLC, 35 F.4th 682, 693 (9th Cir. 2022). In *AK Futures*, the manufacturer of "Cake" brand e-cigarette liquid products brought an action against a smoke products store owner asserting trademark infringement under the Lanham Act. *Id.* at 688. Before proceeding to the trademark analysis, the court was required to consider whether the possession and sale of delta-8 THC was permitted under federal law, and thereby eligible to receive trademark protection. *Id.* at 690.

---

[8]      "THC acetate ester (TCHO) is a synthetic substance created from hemp. Delta-8 and delta-9 THCO – unlike delta-8 THC and delta-10 THC – are not naturally derived substances from hemp. Delta-8 and delta-10 THC naturally occur in cannabis plants, albeit in trace amounts. Because it's far too costly to process entire hemp plants to extract these nominal amounts, processors usually extract cannabidiol (CBD) from the plant and then convert the extracted CBD into delta-8 or delta-10 THC. When created this way, delta-8 and delta-10 THC meet the 2018 Farm Bill's definition of "hemp" and are thus legal under federal law.

Delta-8 and delta-10 THCO is a different story. THCO has been defined as "a non-natural cannabinoid": Also called THC-O-acetate, this compound is not derived from hemp in the same way other cannabis products, like CBD, CBG and CBN are. This means that THC-O is not found naturally in the hemp plant. To synthesize THC-O, acetic anhydride is used. This chemical compound is a highly inflammable, colorless liquid that is typically used in making pharmaceuticals, dyes, fibers, plastics, and explosives. Because of the chemicals involved, production requires specialized equipment. This process begins by extracting Delta-8 THC from hemp. The acetic anhydride is then combined with Delta-8 molecules to create THCO."  Whit Steineker and Hunter Robinson, *The DEA's prohibition of TCHO: Why it Matters and Why It May Not*, THE LEGAL INTELLIGENCER ONLINE (May 18, 2023).

[9]      Letter from Terrence L. Boos, Drug & Chem. Evaluation Section Chief, Drug Enforcement Admin., U.S. Dept. of Justice, to Rod Kight, Attorney, Kight Law Office PC (February 13, 2023).

The Ninth Circuit analyzed the plain language of The Farm Act and noted that "hemp" was removed from the definition of marijuana in the CSA. *AK Futures*, 35 F.4th at 690 (citing 21 U.S.C. § 802(16)). The Ninth Circuit noted that marijuana was still listed as a schedule I controlled substance. *Id.* (citing 21 U.S.C. § 812 sched. I(c)(10)). Schedule I also continued to list [THC], but "it now exempt[ed] '[THC] in hemp.'" *Id.* (citing 21 U.S.C. § 812 sched. I(c)(17)). The Ninth Circuit further noted that the DEA had incorporated the Farm Act's definition of "hemp" into its regulations. *Id.* (citing 21 C.F.R. § 1308.11(d)(31)(ii)). The Ninth Circuit thus concluded that delta-8 products were included in the definition of "hemp" if it contained no more than 0.3% of delta-9 THC. *Id.*

Defendant Boyd Street argued that delta-8 remained a schedule I substance due to its manufacturing method, and in support, it relied on the DEA's explanation of its own implementing regulations. *See AK Futures*, 35 F.4th at 692. Specifically, those regulations noted that "[a]ll synthetically derived tetrahydrocannabinols remain schedule I controlled substances." *Id.* (citing 85 FED. REG. at 51,641). Boyd Street also referenced the DEA's website which listed delta-8 THC as being controlled under schedule I. *Id.* at 693. According to Boyd Street, delta-8 THC was a synthetic cannabinoid because it was "extracted from the cannabis plant and refined through a manufacturing process[]" to make it "concentrated and flavored." *Id.*

The Ninth Circuit, however, rejected Boyd Street's take on the DEA's stance of delta-8 THC products. It specifically rejected Boyd Street's reliance on the website to show that delta-8 THC remained controlled because it was inconsistent with the statutory

text and the DEA's own regulations. *See AK Futures*, 35 F.4th at 693. As such, the agency's position as indicated through its website was afforded no deference. *Id.* The Ninth Circuit also did not consider the agency's interpretation of the definition of "hemp" because the statute was "unambiguous and preclude[d] a distinction based on manufacturing method." *Id.* at 692. The Court reasoned that the "clear statutory text" of the 2018 Farm Act "does not limit its application according to the manner by which 'derivatives, extracts, [and] cannabinoids' are produced." *AK Futures*, 35 F.4th at 692. Rather, "it expressly applies to 'all' downstream products so long as they do not cross the 0.3 percent delta-9 THC threshold." *Id.* (citing 7 U.S.C. § 1639o(1)).

While the court recognized that the scope of the Act's legalization of hemp was "broad", the court noted that the definition's breadth did not make the statutory definition ambiguous. *AK Futures*, 35 F.4th at 692. Moreover, the court opined that even if "Congress inadvertently created a loophole legalizing vaping products containing delta-8 THC, then it is for Congress to fix its mistake." *Id.* at 693. As a result, the court found delta-8 THC "fit comfortably" within the statutory definition of hemp as it may be "properly understood as a derivative, extract or cannabinoid originating from the cannabis plant and containing 'not more than 0.3 percent' delta-9 THC." *Id.* at 691.

The Court finds the Ninth Circuit's interpretation of the Farm Act and the definition of "hemp" contained therein to be persuasive. Thus, if this case were a simple matter of the legality of delta-8 THC, Zini would be able to show a likelihood of success on the merits. Having said that, however, the Court is unable to grant Plaintiff's motion

for preliminary relief because the representative delta-8 product that Zini wishes to sell may still not meet the definition of hemp under the Farm Act.

Plaintiff supplied the Court with a "Cannabinoids Analysis" of a product labeled "Pink Lemonade, 25mg D8 230105DEPLX (4.5 g)" to demonstrate that the delta-8 products he intends to sell meet the statutory definition of hemp. (Doc. 15, Exh. 1). The product contained both delta-8 THC, as well as delta-9 THC in an amount below 0.3%. This would appear to qualify the product as "hemp" under the Farm Act. However, Lines 33 and 35 of that analysis indicate that Pink Lemonade also contains .076 mg/g of delta 8-THCO and .066 mg/g of delta 9-THCO. *Id.* The fact that this product contained THCO was not addressed by either of the parties. Based on the Court's research, however, THCO, also known as THC-O acetate, appears to be a synthetically sourced cannabinoid.[10] Whereas THC naturally occurs in the cannabis plant, THCO is synthetically produced through the chemical reaction of acetylation.[11] There is limited peer-reviewed research on the potency and effects TCHO.[12] However, anecdotally users

---

[10]    The term "synthetic cannabinoids", sometimes shortened to "syncans" is often associated with and used to describe man-made research chemicals that either structurally resemble Δ9-THC, the major psychoactive compound of cannabis or mimic the pharmacological effects of Δ9-THC. *See* Alaina K. Holt et al., *Δ8-THC, THC-O Acetates and CBD-di-O Acetate: Emerging Synthetic Cannabinoids Found in Commercially Sold Plant Material and Gummy Edibles*, 46(8) J. ANAL. TOXICOL. 940, 940 (2022).

[11]    For additional details regarding the acetylation process, see Neal L. Benowitz et al., *Vaping THC-O Acetate: Potential for Another EVALI Epidemic*, 19(1) J. MED. TOXICOL. 37, 37 (2023).

[12]    *See, e.g.*, Alaina K. Holt, *supra* note 8 at 941. (noting that "[c]linical studies evaluating the effects of Δ9-THC-O-A in man using modern methodologies are lacking, and there is no known pharmacological data available for Δ8-THC-O-A, Δ10-THC-O-A or CBD-di-O-A.").

have reported that it gives a more extreme high than regular delta-9 THC.[13]  Because "hemp" as defined by the 2018 Farm Act is limited to "materials derived from the plant Cannabis sativa L," the addition of a chemical whose origins are not found in the Cannabis sativa L plant, may disqualify THCO as well as any substances containing it, from the definition of "hemp" as defined in the 2018 Farm Act. This is because THCO, unlike delta-8 THC, apparently does not derive from the Cannabis sativa L plant, but rather is synthetically sourced.

In fact, the Ninth Circuit in *AK Futures* noted this distinction when it rejected Boyd Street's argument that delta-8 THC was a schedule I substance because of its method of manufacture. As noted previously, the Ninth Circuit gave no deference to the DEA's statement on its website that delta-8 THC was still controlled because it was inconsistent with the statutory text and the DEA's own regulations. *See AK Futures*, 35 F.4th at 693. In citing to those regulations, the Ninth Circuit noted that the DEA did not appear to agree with the position taken by Boyd Street and noted the following:

> [T]he DEA does not appear to agree with Boyd Street as to what makes a cannabis product synthetic and thus unlawful. In the same passage quoted by Boyd Street, the DEA explains the Farm Act does not affect "the control status of synthetically derived tetrahydrocannabinols" because hemp, as defined by the statute, "is limited to materials that are derived from the plant Cannabis sativa L." 85 Fed. Reg. at 51,641. *This language suggests the source of the product — not the method of manufacture — is the dispositive factor for ascertaining whether a product is synthetic.* A recent agency letter bolsters this understanding. There, *the DEA clarifies that "synthetic" delta-8 THC is produced "from non-cannabis materials" and thus remains* banned. . . . In short, the DEA appears to understand the Farm Act's definition of hemp in the same manner as this Court.

---

[13]     *See, e.g.*, Anthony Franciosi, *THC-O-Acetate: What It Is and What You Need to Know About It*, Honest Marijuana Co., (2019), https://honestmarijuana.com/thc-o/.

*Id.* at 692 (emphasis added). The Ninth Circuit clearly indicates that the source of the product is critical to determining whether something falls within the definition of "hemp" and is thus legal. Whereas delta-8 THC is derived from the Cannabis sativa L plant, THCO is not as it appears to be synthetically created through an acetylation process.

Moreover, the DEA has specifically indicated that THCO does not meet the definition of "hemp" in the 2018 Farm Act. (Doc. 21, p. 7). On February 13, 2023, the DEA issued a letter in response to a request from North Carolina Attorney Rod Kight inquiring about the control status of THCO. Therein, the DEA noted:

> The CSA classifies tetrahydrocannabinols (THC) as controlled in schedule I. 21 U.S.C. § 21 C.F.R. 1308.11(D)(31). Subject to limited exceptions, for the purposes of the CSA the term "tetrahydrocannabinols" means those *"naturally contained in a plant of the genius Cannabis (cannabis plant) as well as synthetic equivalents of the substances contained in the cannabis plant and/or synthetic substances, derivatives, and their isomers with similar chemical structure and pharmacological activity to those substances contained in the plant."* 21 C.F.R. § 1308.11(d)(31).
>
> *Delta-9-THCO and delta-8-THCO do not occur naturally in the cannabis plant and can only be contained synthetically, and therefore do not fall under the definition of hemp.* Delta-9-THCO and delta-8-THCO are tetrahydrocannabinols having similar chemical structures and pharmacological activities to those contained in the cannabis plant. Thus, delta-9-THCO and delta-8-THCO meet the definition of "tetrahydrocannabinols," and they (and products containing delta-9-THCO and delta-8-TCHO) are controlled by schedule I.

*Id. (*emphasis added*)*. The DEA's position regarding THCO mirrors the Ninth Circuit's interpretation of the Farm Act and thus appears consistent with the statutory text and regulations. This is obviously a different situation from Boyd Street's reliance on a

statement on the DEA website that apparently conflicted with the plain language of the statutory text and its regulations. As such, a strong argument can be made that the DEA's position on THCO should be given deference.

By denying Zini's motion, the Court is not expressly taking the position that products that contain delta-8 THCO and delta-9 THCO are illegal and thus cannot be sold. For starters, there was no evidence presented to the Court regarding the nature of delta-8 THCO and delta-9 THCO. The information contained in this memorandum was based on the Court's preliminary research into the matter. It could very well be shown through further discovery and with the presentation of expert evidence and testimony that THCO derives, originates, or is extracted from the Cannabis sativa L plant, thus qualifying it as "hemp." Or perhaps it could be shown that the amounts of THCO in Zini's products and others like it have a negligible or de minimis impact. Alternatively, other legal arguments could be presented in support of selling products containing THCO. Given that neither party addressed this issue and considering the thin state of the record at this preliminary stage, the Court cannot find that Zini has a likelihood of success on the merits of his case. Because Zini has failed to satisfy this preliminary threshold showing, the Court need not address the other factors, nor does it need to conduct the required balancing analysis. As such, Zini's Motion for Preliminary Injunction is DENIED.

CONCLUSION

For the reasons previously discussed, the Court **DENIES** Plaintiff's Motion for Preliminary Injunction. (Doc. 15). The Court will set a status conference with the parties by separate docket text order to discuss the setting of a new case management order.

**IT IS SO ORDERED.**

**DATED:  March 30, 2024.**

Gilbert C Sison

Digitally signed by Gilbert C Sison
Date: 2024.03.30 22:42:17 -05'00'

**GILBERT C. SISON**
**United States Magistrate Judge**